Case number 20-5965 Henry Kaplan v. University of Louisville et al. Oral argument not to exceed 15 minutes per side. Mr. Clarson for the appellant. Thank you. May it please the court, my name is Kevin Clarson. I'm here today representing the appellant Henry Kaplan and I'd like to reserve three minutes of my time for rebuttal. That's fine, thank you. Dr. Kaplan is here today and brought this appeal to correct what we believe are the reversible errors in the district court's opinion of July 24th in which the court did not recognize that on November 15th, 2018 that Dr. Kaplan, who at that time had been an 18-year tenured professor at the University of Louisville and who had had an epidemiologist both at the University of Louisville and prior universities, was deprived of his constitutionally protected privilege status and the privileges that attach to that status without the constitutionally mandated due process he was entitled to. This was also decided on a motion to dismiss. We believe that the court erred in not applying that to Dr. Kaplan and taking all well-played allegations is true. We believe that that is error and that we have more than pled the allegations to survive a motion to dismiss standard at this time. There's, this is 12B6, but there's a considerable amount of evidence, I guess, in the record. There are a lot of letters and whatever the communications were, the report, all of that. Is there anything, what else would come out on discovery, for example? I'm just curious. Thank you, Jay. I think quite a bit, actually. And I agree that there is a lot of documentary evidence as part of the complaint. However, what the court doesn't have, what the court below didn't have is the explanation for why, for example, Dr. Kaplan, who up until November 15th, 2018, had an exemplary record at the University of Louisville, why all of a sudden he was being accused of abusing his power and position based upon anonymous allegations that were supposedly reported to the dean and school. And that accuser has never been identified. I think one of the due process requirements that both sides cite is that you should be able to rebut and confront your accuser. That has not happened. That identity has not been identified in the record. So there would be discovery as to who that was, what the actual allegations were. But why? Oh, I'm sorry. Go ahead. Why does that? I mean, I guess I'm curious why that matters. I mean, he, he eventually had a hearing, right? I mean, there was, I mean, we can debate about and we should talk about kind of whether, even if you're right, whether the post deprivation process would have been, was enough here. But I mean, he had a hearing. He had a meeting beforehand in October. They told him they were doing the investigation. I mean, what, why does it matter who the accuser was? I'm confused. I mean, why did that didn't come out at the hearing? I take it. It did not. It did not judge. And if you were to look at the record of the hearing that's before the court, there's no indication of who the accuser was. And there was no indication of who the accuser was in the audit report that was the investigation into this and why that's challenging. I'm sorry. Are you challenging the adequacy of the post deprivation procedures? That is the, the post 10 pre-tenure denial procedures, right? At the, what culminated in the April events where he was stripped of his tenure. We had a bunch of process there. And I agree. That is inadequate. And I agree. I'm just a little confusing. And that's why this is a unique case. What we have focused on specifically is the November 15th, 2018 deprivation. There was. Okay. So I get that. So in answer to judge Nelbandian, you're saying, well, there's this hearing. Did you ask to confront the accuser at that hearing? Well, the, the accuser was, I think I want to step back for a second, because I do want to take the pre-termination question, which I think is the most important here. And I think what, what separates judge Kaplan, I'm sorry, Dr. Kaplan in this case on that period of time is I know the lower court relies upon and defendants rely upon a lot of cases that have to do with administrative position. For example, the cross case where a person was, was taken out of a chairmanship, but that is that it matters that Dr. Kaplan was tenured at the time and wasn't just removed as chair of the department. He was, as we mentioned in our brief persona non grata, which if you look up in black's dictionary is the unwanted person and stripped of every tenured privilege that he had at that point in time, it's not just a fight over the chair position, which the district court's opinion kind of leads into then goes to the tenure. The fact that if you have a tenured professor with all the privileges that we recognize, they'll not recognize as attached, then stripping him of the ability to set foot on campus and research, practice medicine. What's your best case for someone who is not terminated and they're getting their paycheck, they're stripped of significant things, you know, ability to practice or see patients, whatever it is, what's your best case for why that person gets pre, pre deprivation process, as opposed to the post deprivation hearing and things that he got, assuming that it was a deprivation. A couple points to that, first of all, we know that from the lane case and from the frost case that the same district had before ours, that post deprivation doesn't cure a pre deprivation violation. One of the issues I know the lower court found was that the fact that he was let on administrative leave with pay seemed to be some kind of panacea for allowing them to if, and that the court specifically talked about the Jackson case from this circuit, which attributed a quotation to Loudermill that if you basically suspend a tenured person with pay, there is no due process violation, but that's not the Loudermill quote. I actually went back and I would invite the court to look back at the Loudermill citation. And in the Loudermill context, which was a pre termination case, the two individuals in that case were two, it was a mechanic. Well, so if Jackson is our law, even if Jackson, if Jackson tries to apply Loudermill and does it wrong, we don't get to say, I think the Jackson panel got Loudermill wrong and I would decide that case differently. We're bound by Jackson. So you have to explain why your case is different than Jackson, not that Jackson is wrong. That's the whole point of precedent and stare decisis. I don't get to write all the cases over. I understand that. I'm not, I guess I'm not, I'm not, I didn't mean to say that this, this court should overturn Jackson. The point is that in looking at the admin leave with pay, you're considering that that person is only being, and specifically the Crosby case, Dr. Kaplan was just not let go from his chairmanship. Again, he was, he was let go without any process, however you want to call it, from his tenured positions. And those tenured positions are protected. And so the police officer in Jackson, right? So there's probably accoutrements of the office of being a police chief, right? Like maybe you get a parking spot and you get to wear a badge and, you know, walk around in the street in a uniform and that's arrest people. Like there's all kinds of stuff you get to do if you're a police officer and he didn't get to do any of those. None of whatever the accoutrements of his office were, he didn't presumably get to keep climbing the ladder towards, I don't know what the next step up in rank is. All, how is your professor different than the police officer in Jackson? And that's why we talked about the Gunasekara case, Your Honor, because in that, in that case, it specifically distinguished Jackson. Jackson lost no benefits, no pay. Here and in Gunasekara, our professor lost arguably benefits. We can set aside the pay. There's no argument that the benefits and the privileges that go with tenure, he was not allowed to do, not from November 15th, 2018. Why are we setting aside the pay? Isn't the pay the biggest factor? I mean, if you, if you're, if you lose pay, okay, you clearly have lost a property interest, right? Yes, I would agree with that. But again, we're talking about a tenured professor. But is there an allegation, do you have an allegation that he lost money from not being able to see patients or not being able to get grants or whatever it is that he personally had a property interest that was lost other than the benefits of the job, the other benefits? Well, he, when he, when he lost his chairmanship, he would have lost a stipend for being chair, but I don't want to downplay the importance of the tenure benefits to a tenured professor. I mean, that's the point of the job. You're, you're to be, to get tenure is, is the whole point of why a professor wants tenure. That's why professors want to go on a tenure track. There are some, it's not just a status. It allows you protectable benefits, such as research, such as scholarship. Yeah, I understand that. Here's, here's the question for me. I don't think there's any question. Well, let me just back up and say, this guy lost a lot. And you add it, you, you are correct in saying that there was, there was harm. He really, he lost everything. There's no question about that and everything going forward. My concern is the ganassacare, if I'm pronouncing it correctly, he was, that person was not given any pre or post deprivation due process. And I'm struggling because I don't see a case that would say that the post deprivation process that Dr. Kaplan got was not adequate under our law. Can you give me a case in which post deprivation provisions were made and that's not ganassacare, but another case and held to be inadequate because I'm looking at the case law and it seems like our case law says, even if you are really harmed, post deprivation due process is all that is accorded. That's a good, thank you for the question. I, I want to distinguish what happened because we, we, I think the court also got confused below as to what actually happened in the post deprivation process that Dr. Kaplan ultimately had. And I see my time's up. If I may just, thank you. There's two distinguishing factors here as to the other cases that were relied upon for post deprivation process. The first is again, that Dr. Kaplan is a tenured professor because the lower court distinguished the issue based upon the name clearing hearing. And it said that he did not request or have a name clearing hearing so that, and then said, well, but he had a grievance process. Well, the grievance process did not allow Dr. Kaplan to address the issues of the deprivation that affected his tenure. The grievance process, according to the Red Brook, which we incorporate in which we have as part of an exhibit allows the university to only, you're only allowed to bring what you're charged with. So to the extent that Dr. Kaplan was never allowed to present at the grievance hearing, how he was harmed by the lack of a pre deprivation process for his tenure, because the issues at the grievance hearing were about. But what he was allowed to do was challenge the grounds. And he challenged all six grounds. And, and two of them were found to be insufficient. I mean, this was a two day hearing. I'm just struggling, you know, I'm struggling for you to point me to the case law that says even where we take away everything, we can give you due process in a post termination hearing. And there's just no question that he was not that. And I guess I would, I would just disagree factually, Your Honor, again, I guess I want to go back, go back to I think it's important to consider again, we're here on a motion to dismiss and part of part of our allegations were that the charges were false, that he wasn't allowed to address the real issues that were the deprivation on November 15. Again, if this was just a chairmanship loss, which the allegations of the grievance hearing discussed regarding whether he was attempting to sell the department's practice, or whether he was, you know, the list of things all had to do with him being chair. But that's not the factual situation we have. And so to the extent that that grievance hearing and his ability to have a grievance hearing under the red book, which limited him to charges based upon essentially his role as chair, there wasn't a process that was allowed for him to discuss the problems of the deprivations of his tenureship, and how that impacted him for the year and a half that he was before he even had a hearing. Thank you. You'll have your rebuttal time. Thank you. Yeah, I'm sorry. Do you have another question? It'll and it'll be quick. So you know, these Matthews, these Matthews factors ultimately are sort of asking the court to create some procedures, right, we balance the factors, and then we create some kind of procedure that that will be adequate under the Constitution. But what I don't know is what procedure did you want that you did not get? So what did you want to happen before November? Because I don't see you telling us anywhere, like if I had gotten this, it would have helped me show that. So what did you want? Well, I think what, and Loudermill also talks about Matthews, and under the Loudermill standard, you know, there wasn't, there didn't need to be a formal hearing. But to the extent that you're going to strip away his tenure, which means he can't practice law, he can't research, he can't do scholarship, there's an assumption there that he's doing something wrong to lose those privileges and benefits. What should have happened is there should have been some informal hearing, informal meeting, which I think Loudermill and Matthews discuss, of here is why you can no longer practice medicine indefinitely. Here is why you can no longer advise graduate students, etc. Or is it correct that it's you can no longer do it at this school? It's not a bar from his doing it if someone else hired him, correct? That's true. But factually, you have to also consider Dr. Kaplan's situation of being at the end of a career, somewhere that long, and it is not... I'm sorry, I interrupted your, please finish your response to Judge Larson. I'm sorry. I'm sorry, Judge. Anyway, I think if we looked at just the, what Loudermill and Matthews discussed, the informal notice of the charges as to why he can no longer practice medicine, or advise students, all the other things a professor does, because as we know, there was no finding that anything was missed toward of those privileges that were stripped of him. And if he'd gotten that, he would have put on some evidence at that time that's different than the evidence he put on at the end of the process in April? It could have been, yes. If he had been told, and I know this is hypothetical, Dr. Kaplan, we're not going to allow you to treat patients because X, Y, and Z, or you're a bad doctor, you've had complaints from your patients, or we were not going to let you mentor students anymore because you have complaints. He would have known that those were issues that he should be able to prepare a defense for either and respond there. That's not what the university's reasons were. The university's reasons have been consistent throughout. It's because they thought he was trying to sell off the practice. Exactly. But it has nothing to do with taking away his tenure privileges. That may have everything to do with not wanting him to run department anymore. And they certainly could have put him on administrative leave as chair. But that's not what they did. They essentially took everything he could have done as a professor, regardless of whether he's wearing an administrative hat or a tenure hat, and said, you're done. Okay. Judge Nabandian? I'm sorry, no more questions? Thank you. Would you pronounce your name for me, Mr.? It's Barsh, Your Honor. Much easier. Right, thank you. May it please the court, Matt Barsh on behalf of the Appellees. Listening to Dr. Kaplan's presentation of this case, and as I prepare for this hearing, there's a case that Dr. Kaplan relies upon, Smock v. Board of Regents of University of Michigan. There's a quote in that case, I confess, I really just noticed for the first time a day or so ago. If restrictions on plaintiff's interactions with graduate students are only changes in job duties, her claim must be dismissed, for one does not have a property interest in one's job duties. And as we've been talking, what happened was, on November, there were allegations that were they were presented to him in October of 2018. And he was told this is going to be investigated by a special chair review committee. On November 15th of 2018, and the letter about this is attached as an exhibit to the amended complaint, Dean Gansel met with Dr. Kaplan and said, we are placing you on leave in total, you're not allowed to do your job duties because of these issues that audit services is investigating, and you're going to be placed on paid leave while this process plays out. So at the outset of the investigation, Dr. Kaplan was provided with the notice of the charges against him, and then was placed on paid leave. And what Loudermill, what Jackson, um, I came across a Judge Posner opinion, SWCC versus City of Chicago. The whole notion behind paid leave is that paying someone not to perform their job duties, that's not a deprivation, there's a there's a quote in SWCC versus City of Chicago. Do you think so that under Jackson, I mean, do you think there's basically no scenario where you would lose a protectable interest as long as you were getting your paycheck? Is that your position? Um, you know, it's, it's, it's pay and benefits. So if I'm getting paid, but perhaps my health insurance gets cut off that that might be that might be something but if I'm functionally being paid, not not to work, my, my, my property interest and continued employment is not in into the office. And but why isn't it different? And maybe I don't know whether it would depend on the facts. But why if I have, I mean, like a nine to five job, I have certain job duties, I come in, you know, and I get suspended with pay. It doesn't seem like I've lost all that much. Although I, you know, I might beg to differ a little bit on that. But if I have a job where I'm a doctor, I'm running a practice, I'm seeing patients, I have to apply for grants, there's all kinds of other stuff that I'm doing that doesn't. I mean, it probably affects my paycheck a little bit, because it affects my reputation in the in the community and the science community. And I'm not allowed to do any of that. But I get a pay, I get my paycheck. That's, that seems to me just different. I don't know how to articulate it. But that just seems like a different situation than suspending somebody with pay. Sure. And, you know, change the facts of this case a little bit had had audit services completed its investigation and said nothing to see here and brought Dr. Kaplan back. You know, he would have been back in his role. And performing those duties, he would have basically picked up where he left off and I got paid during that period of deprivation of any property interest. Because what about I thought at the November 15, they took everything away from me. So let's say that investigation takes a year. They've already removed him from their letterhead. They've deauthorized him to do grant requests. They're not letting him see patients, even the patients that he is the only treating physician for in his specialty. And that is, that's a reputational, as well as a, because he's a doctor, as well as his physicians rights to I'm, I'm understanding judge now bandians question to indicate that isn't there a distinction here, where you're not just a paid hourly worker, but in fact, the deprivation is of the ability to use your own independent credentials and rights to continue in a profession, you're denied that opportunity. Is that not different? Well, he certainly had the opportunity and ability to do that elsewhere. And in the university context, it's not he was being paid by you. If he was being paid by you, he could not be employed by another university after you fired him completely. Yes, he could, but not during the course of that. So it is not uncommon at the university level for faculty members and professors to take sabbaticals. And in term, you know, this, this, there's, there's no allegation, this is something that was that was broadcast out loud to the world. In fact, I think the amended complaint points out that even after Dr. Kaplan was removed entirely from the university, the university still listed him as a faculty member on its website. But so the situation where he's he's being paid not to work, not performing those job duties, that that functionally works the same as taking a sabbatical. And then, you know, after after coming back from from a year, either working elsewhere or doing something else, you pick up where you left off. And again, we're talking about the interest in performing the job duties itself, something that certainly the smock court said. Yes, so I get that. So, so it's is the is the would it be different here if I don't think he has alleged in his complaint, but if he had alleged in his complaint, like the, it took too long. So there's a deprivation of my status as a physician at the university physician, a university professor, all of that stuff that he couldn't do in that 18 months, if he had alleged, the process the post deprivation process was inadequate, because it took too long. Would that be a different case than the case we've got now? Because I'm not sure he's alleged that in his complaint. You know, I have I have thought about that. And I have looked for case law that specifically addresses that that issue. And I'll confess, I've not come across anything to suggest that the length of an investigation or pre deprivation process would, because surely, like, what if you had put him on leave in November of 2018? And then you you left him there, and you kept paying him. And then you're like, Oh, yeah, okay, now it's November of 2028. 10 years, and now we'll give you some process. Surely, he's been deprived of something in that 10 year time, right? Like you didn't really give him process. What's it? In an extreme example like that? I think I think yes, that there, there may be an argument that there was a deprivation of process there. Again, from a from a standpoint of a public employer using public funds to pay someone's salary. For the spirit of time, I don't think there's an the length of time, but he doesn't. He doesn't allege anything about like, the process was inadequate because it took too long. Is that your understanding of the complaint? That is my read of the amended complaint on her. And then the the guna secure a case, I do want to point out, as as the court has noted, there was no process in that case. And also, what, what was at issue in that case? Yeah, guna secure. I'm probably saying it wrong. Also. He, he was removed from from the graduate faculty, but that removal, it wasn't just an elimination of job duties, that removal carried with it a loss of salary. And and also a loss of benefits, because he was no longer on graduate faculty, he wasn't getting paid as much money, and he had to teach more courses. So functionally, guna secure, I had to do more work for less pay. That's, that's something I think we can sort of easily conceptualize as as a deprivation, especially in that case, where there was no process pre or post deprivation. And that's not, that's not the case here. We were really talking about two property interests that at issue Dr. Dr. Kaplan's chairmanship, which the district court correctly said, no protected property interest in this because that's an at will, administrative appointment, the language in the red book that's incorporated by reference, says chairs serve at the pleasure of the Board of Trustees and can be removed at any time by President. The this court said in Crosby versus University of Kentucky, that's enough to say there's no property interest in the chairmanship. So putting the chairmanship aside, we're really talking about the property interest that Dr. Kaplan had in his position in his tenured position, which Loudermill, Jackson are clear that paying someone prior to terminating their employment while there's an investigation proceeding while the deprivation process plays out, that's not a deprivation. And as Jackson talks about Loudermill, that solves the problem of what if he and I don't know, I don't think this allegation is in the complaint either, but what if he were benefiting financially from treating patients in the clinic, so he got, I don't think this is quite you can tell me if I'm wrong, he can tell me if I'm wrong, but so he was making money from treating patients, you kept him on salary, but his job expectation is plus this revenue stream from the patients, that'd be different. I think it may be different because I think what would be an issue there is turning on what expectation does Dr. Kaplan or any other faculty member have the situation as far as payment from treating patients now, with salary, that's a guaranteed amount, regardless of how much or little one works. If you're talking about I get a percentage, and this is not in the amended complaint, you're correct about that, but if the allegation is I get a percentage of every patient I see, I'm incentivized to see as many patients as possible, perhaps that is an issue with respect to whether there's a property interest, and if so, what are the contours of that property interest, because the property interest is the expectation of receiving a salary, and if I'm seeing more patients, fewer patients, I think there's a distinction there as to at least as to what the contours of that property interest might look like. Let me ask you this question, I don't know if it's related to the process at all, but at least I recall reading something that suggested that he was treated differently than the pediatrics people were with regard to getting outside financing and a loan or whatever it was, I don't know the specifics of what they did and what he did, but there is at least some suggestion that he was being singled out, whereas other departments were not. Do you have a response to that? Well, the amended complaint doesn't contain a whole lot of allegations about this, I can tell you factually the partnership that arose with pediatrics didn't originate in pediatrics, it was a university-wide initiative, whereas with Dr. Kaplan, the investigation turned out, I think this is clear in the amended complaint, this was something that Dr. Kaplan did without the knowledge of the School of Medicine or anyone else in the university at large, so factually those are different situations. And if I'm clear then in the October letter, October 25th letter, it outlined the seeking a loan or signing a lease, whatever those were, and they do seem kind of unrelated to whether he was competent to keep patients. Why was that kind of, it seems overbroad, I guess the punishment or the suspension? Again, I think we're constrained by the amended complaint, but what happened was the plan in October of 2018 was that Dr. Kaplan was just going to be placed on leave in his role as chair, and then I think as the Special Chair Review Committee was looking into this, there became just sort of broader concerns about can we trust Dr. Kaplan, and so that ultimately why he was placed on leave. And that was what occurred between October 25th and November 15th? That's correct, Your Honor. And I see I'm just about out of time. Thank you. Mr. Carson? Thank you. I think counsel began with the Smock case, and I'm going to do the same, but Smock and Frost both have statements in there that essentially say something to this effect. Plaintiff as a public employee is owed an adequate pre-deprivation hearing before being dispossessed of privileges short of being fired, and Frost, the same judge who decided our case, has similar. And that's important here. Both those cases recognize that there has to be some process before being deprived of a property interest, and I want to just make sure that these aren't just job duties. That downplays, and I think the courts recognize, I think Judge Stranchey recognized in one of your questions, that the tenure, the reputation, the scholarship, research, those aren't just run-of-the-mill job duties that any nine-to-five employee has. There is a reason those are elevated constitutionally to protection. Those are because they're not just run-of-the-mill job duties. So I think that... Counsel, an untenured professor can do research and teach and all of that stuff. The point is just that they don't hold their job at the pleasure of the dean or the university president. So tenure itself is... You can't fire me absent cause, but I mean, untenured professors can do all the things that you're saying. So I don't think it has to do with tenure, right? It does. It does because this is the plaintiff before the court. It's important in this particular case because I think there was a fundamental... And I think defendants want to argue that all of this is jumbled together. The issues within his chair bleed over into issues with him as a professor or a medical practitioner or a researcher, and they don't. And there's no record of that in the case. I think Judge Nalbandian's question got to that, is there is, and there should have been distinction between putting him on leave or punishing him as chair and doing the same in his other capacities, which are constitutionally protected. And I think those have to be separated out, especially again, at the point in the case we're at. It's a motion to dismiss case. If all the allegations are taken in our client's favor, which they should have been, then we have met the burden to at least go forward to explore, to go back to where we started the day with the discovery to allow us to determine. What is it that he should have gotten before November? Are you saying that he should have basically gotten the hearing before they suspended him? I don't think they should have had a full-blown hearing as in the grievance process, but to your... The last, I think, Judge Nalbandian with counsel about the overbroad suspension and the chair review, the answer to the court was between the October letter and the November deprivation, there was supposed to be a special chair review, which only would have related to him as the issues with chair, but that review never happened. And the complaint says that review never happened. If you look at the complaint, that review, which would have been an informal opportunity for Judge Nalbandian, was canceled and then he was put on persona non grata. So even the buildup between the October 25th letter that we're going to investigate you for chair concerns and put you through the informal chair review process didn't take place. That is in the complaint and that's actually not disputed in the record. So even if they were investigating him as chair leading into November 15th, they didn't even provide him that process. He wasn't interviewed, he was put in to this persona non grata status. So is this actually your argument? Maybe they could have put him on leave from his... So it's in his position as chair that he has the ability to do things like sign leases and enter into financing agreements and all the things the university is worried about, but that all comes with his status as chair. So the response should have been put him on leave with respect to the chair, but these other things, treating patients, teaching classes, doing research, don't pose any threat to the university. So they couldn't take those away without process. So it's a sort of a nexus argument. Is that your argument? That's correct, Your Honor. And we know that there were no issues with that because there haven't been any accusations even through the audit report that the investigation was done at no point in time was he accused even at the outset of the deprivation in the letters that the court has seen. There's no allegations there that you pose a danger, which again goes back to Loudermill because in the discussion of Loudermill, when they're talking about putting employees, should the employees be termed before the pre-termination process, the discussion there was if there's a danger, you can alleviate that danger by putting them on pay, but Loudermill actually recognized that there's an interest of keeping the employees involved unless there's a danger. There is no danger in the record that the university and all the documents provided in this court that there were any dangers of him practicing medicine, researching, mentoring students, or teaching. We thank you both for your briefing and your good arguments here today. The and in due course, an opinion will be rendered. Thank you. Thank you, Your Honor. That concludes this session. This honorable court is now adjourned.